[No. A044157. First Dist., Div. Three. Aug. 23, 1990.]

In re the Marriage of CLYDE W. OSTLER, JR., and VICTORIA J. SMITH.
CLYDE W. OSTLER, JR., Appellant, v.
VICTORIA J. SMITH, Respondent.

34

COUNSEL

Camera & Colyer, Paul Camera, Mary Halbert-Brown, De Goff & Sherman and Richard Sherman for Appellant.

Robert Roth for Respondent.

OPINION

BARRY-DEAL, J.*—After a hearing on the reserved issues of support, custody, and attorney fees in his action for dissolution of marriage, Clyde W. Ostler (Clyde) appeals from the order awarding spousal and child support to Victoria J. Smith (Vicki), whose maiden name was restored to her in the earlier judgment dissolving the marital status. He claims that an escalation provision for spousal and child support, based on a percentage of his future bonuses over and above the fixed monthly amounts, was error as a matter of law and an abuse of the court's discretion. This issue is apparently one of first impression, as we have found no California case directly on point, nor have the parties cited to any.[1]

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Acting Chairperson of the Judicial Council.

[1] Cf. *In re Marriage of Behrens* (1982) 137 Cal.App.3d 562, 573 [187 Cal.Rptr. 200] (trial court did not abuse its discretion in fixing spousal support award without including a share of husband's future bonuses). Some jurisdictions have sanctioned a percentage award. (See *Reap*

We hold that the order for additional support, based on a percentage of Clyde's future bonuses, was within the trial court's discretion under Civil Code sections 4700 and 4801,[2] and we affirm.

## I. *Statistics and Procedural History*

Clyde and Vicki were married on November 25, 1964. They separated on January 1, 1986, the marriage lasting a little over 21 years. Four children were born of the union: two daughters, who were adults at the time of the bifurcated hearing in May 1988; and two minor sons, Clyde W. Ostler III, born on July 20, 1974, and Joseph Ostler, born on February 22, 1979.

Clyde filed a petition for dissolution of the marriage on March 27, 1986. The issue of marital status was bifurcated, and a judgment dissolving the marriage was entered on December 31, 1986. In March and April 1988, the parties executed a marital settlement agreement and an amendment to it, dividing all of their assets and liabilities. At the bifurcated hearing in May 1988, the parties stipulated to joint legal custody of the two minor sons, with physical custody to Vicki and a reasonable schedule of visitation to Clyde. Thus, the only contested issues at the hearing were the amount and duration of spousal support, the amount of child support, and attorney fees for Vicki.

## II. *Family Background*

Vicki and Clyde were each 17 when they married in 1964, and Clyde had just begun his first year of college. He continued undergraduate and graduate school full-time for about six and a half years, receiving a master's degree in banking.

Clyde was general auditor of a major bank on the date of separation. At the time of the hearing in May 1988, he had become an executive vice-president and chief financial officer, serving directly under the president, the chairman of the board, and four vice-chairmen of the board. In 1971, when Clyde first was employed by the bank, his annual salary was $15,216. It increased in annual increments, and by 1977 he was earning $39,210. From

---

v. *Reap* (1960) 142 Colo. 354, 358 [350 P.2d 1063, 1065-1066] [husband had extreme fluctuations in income because of type of business he pursued; it was within court's discretion to order husband to pay $100 per month as minimum fixed child support, plus 30 percent of his income for support of children and 15 percent for support of wife]; *Edwards* v. *Edwards* (1983) 99 Wn.2d 913 [665 P.2d 883, 886] [percentage awards are valid so long as the statutory criteria are considered and a maximum dollar amount is set]; see also Annot., Validity and Enforceability of Escalation Clause in Divorce Decree Relating to Alimony and Child Support (1983) 19 A.L.R.4th 830, citing cases approving and cases disapproving such awards.)

[2] Unless otherwise indicated, all further statutory references are to the Civil Code.

1978 on, in addition to salary, he received an annual bonus, attributable to work performed in the previous year.[3] In 1988 at the time of the hearing, his fixed annual salary was $165,000, plus a bonus (attributable to 1987 services) of $135,000, or a total of $300,000 in compensation. Clyde also received bank stock and stock options which generate dividends of approximately $18,500 per year in addition to salary. He is provided with an annual car allowance of $11,280 and various other benefits such as partially subsidized health insurance, life insurance, pension contributions, an expense account for business meals, and the availability of executive credit.

Clyde testified that during the last few years of the marriage the parties did not use his bonus to enhance their standard of living, but to fund real estate investments. Vicki, however, testified that the parties "always" calculated receipt of the annual bonus into their spending plans, and at the time of separation the couple had $100,000 in unsecured debt. She said the bonus was taken into account, along with Clyde's raises and dividends, in establishing the family's standard of living and level of indebtedness. She further testified that during the last three years of the marriage, the standard of living was described by Clyde as one of " 'upward mobility.' " Clyde would become angry with her if she told the children that the family could not afford something. He insisted that he never wanted her to tell that to the children. "That he could always afford something, that he's making lots of money and he's going to make more . . . ."[4]

---

[3] The breakdown of his compensation from 1978 through the date of the hearing in 1988 is as follows:

| Year | Salary | Bonus | Total |
|------|--------|-------|-------|
| 1978 | $ 45,833 | $ 10,000 | $ 55,833 |
| 1979 | 52,504 | 12,000 | 64,504 |
| 1980 | 60,000 | 11,500 | 71,500 |
| 1981 | 70,401 | 7,000 | 77,401 |
| 1982 | 80,004 | 7,000 | 87,004 |
| 1983 | 95,000 | 20,014 | 115,014 |
| 1984 | 120,000 | 30,000 | 150,000 |
| 1985 | 140,004 | 75,000 | 215,004 |
| DOS* _____ | | | |
| 1986 | 145,008 | 75,000 | 220,008 |
| 1987 | 160,835 | 150,000 | 310,835 |
| 1988 | 165,000 | 135,000 | 300,000 |

*Date of separation. At oral argument, Clyde's counsel stated that his 1990 bonus was $300,000.

[4] As in most family law cases, the record here has gaps, particularly in specifying how previous bonuses were spent, in describing Clyde's assets and liabilities, and in delineating Vicki's living expenses. We do not fault the trial court, but we do lament that the courts are unable to give adequate time to sensitive family law matters. Here, counsel for the parties set the case as a short cause matter, estimating two and one-half hours for the hearing to avoid the long delay if it were set for a long cause hearing. Of course, it ran over the two and a half hours and had to be worked into the court's busy calendar at a later date. (See *In re Marriage*

Vicki testified that while Clyde was in college full-time, she contributed to the family support by doing housecleaning, ironing, and baby-sitting. She and Clyde had agreed that one of them—Vicki—would be available to the children at all times, and that she would have total responsibility for their upbringing so that Clyde could devote time to an occupation and financial support of the family. They had also agreed that when the children were in high school, she would have time to continue her education. She had not worked outside the home during the marriage, except for the minor jobs mentioned above, and was currently unemployed.

After the couple's separation, Vicki considered moving to San Diego to be near her family. Their emotional and physical support would have enabled her to complete her education with less stress. She decided against this move because the boys needed their father; his influence was more important to them than the help of her family would be to her.

Vicki attended community college from 1965 through 1973, qualifying for transfer to a four-year college. She took a few courses at San Francisco State University through 1975, then dropped out until the fall of 1983, when she resumed taking a few community college classes each semester. She had volunteer work experience in school athletic programs and Little League.

The certified career counselor who evaluated Vicki commented that she was above average in numerical ability, mechanical reasoning, word knowledge, and manual speed and dexterity. The counselor concluded (in April 1987) that if Vicki were motivated, she had the capacity to become a math-science teacher with earnings ranging from $19,000 to $24,000 per year, depending on the school district. The counselor's reservation about this goal was Vicki's stated priority of parenting responsibilities, leaving limited energy for full-time academic involvement. If Vicki were interested in a shorter time frame for employment (about one year), her aptitudes pointed to being a bookkeeper, with a beginning salary in the range of $580 to $1,600 per month and after several years of experience from $1,100 to $2,500 per month. After a short training period, Vicki's capabilities would lend themselves to a position as a medical or dental assistant with a starting salary of $1,100 to $1,500 per month. Without additional training, Vicki's age and lack of work experience or a college degree would limit her to "the typical path used by many re-entry women (i.e., retail sales clerk, general office worker, receptionist)." Earnings for those occupations range from approximately $4 to $6.50 per hour.

*of Morrison* (1978) 20 Cal.3d 437, 450 [143 Cal.Rptr. 139, 573 P.2d 41]; *In re Marriage of Brantner* (1977) 67 Cal.App.3d 416, 422 [136 Cal.Rptr. 635].)

Neither party had any separate property. Vicki exercised her option under the marital settlement agreement to keep the family home in Marin County so her sons could be near their father; it had an equity of $230,000 and required monthly payments of $1,032 on the loan plus taxes of about $191. In the division of property, she received a cash differential of $11,000, some IRA accounts, furniture and furnishings, and two cars. She owed a balance of approximately $25,000 on attorney fees. She thus had no income-producing assets, a net liability of $14,000, and indeed no financial cushion.

Shortly before the hearing, Clyde purchased a home about a mile from the family home and close to the boys' schools.[5] He paid $485,000, wholly financed through an executive loan with his employer bank, requiring monthly payments of $3,644. He pays $550 per month for taxes and insurance. In the division of assets, Clyde received some IRA accounts, and all of his employer bank stock and stock rights, with all obligations relating to their acquisition; he receives approximately $18,500 per year in dividends. Each of the parties received one-half the value of the insurance annuity with the bank retirement plan, which terminated in 1984, after which a new retirement plan was instituted. Clyde received his interest in the new plan.

At the time of the hearing in May 1988, both parties were 41 and in good health. Vicki has a genetic disorder called Hashimoto's thyroiditis which is controlled by medication and requires medical supervision. She testified that it does not interfere with her ability to function, but does interfere with her ability to manage stress. The two minor boys were about nine and fourteen at the time of the hearing. The older daughter has completed college and is working in San Diego. The second daughter is still in college in San Diego, but her expenses are paid through a trust fund.

### III. *The Statement of Decision and Order*

After the matter was submitted, each party filed a posttrial brief. Clyde urged the court in awarding support to consider only his fixed salary, not his bonus income, and if the court did consider his annual bonus, to award only a percentage, with a ceiling of $1,000 per month on the maximum amount to be paid. Vicki proposed that support be based on Clyde's total income—both fixed salary and annual bonus. The disposition of the bonus income was obviously the major impediment to settlement and is the focus of this appeal.

Each party requested a statement of decision, which the court filed on September 15, 1988. The court's statements relating to the parties are

---

[5] The record does not substantiate Vicki's statement in her respondent's brief that Clyde has remarried, but he does not deny his remarriage in his closing brief. His financial declaration states that his companion living in the home has a gross monthly income of $1,000.

included under family background above. Relevant to the contested issues, the court found as follows.

Clyde's gross salary is $13,750 per month, plus dividend income of $1,542 per month. He has mandatory deductions of $4,606 per month, leaving him with a net income, excluding bonuses, of $10,686 per month.[6] He has the ability to pay $5,900 per month for support.

Vicki has no income, either from earnings or assets. She has been taking college courses and is a capable individual and an excellent student. "She is presently in a position, as far as her education is concerned, to become an engineer or a math teacher, her alternative stated career goals, within three years; in addition, based on the opinion of the vocational career counselor, . . . Wife has an aptitude for and could become either a bookkeeper or a medical or dental assistant within 1 to 1-½ years, but Wife has no interest in those professions at this time."

Vicki devoted her time during marriage mainly to domestic duties and raising four children. Clyde acquired his education during marriage. Vicki has custody of the two minor children about 70 percent of the time, with the balance of 30 percent being spent with Clyde.

Vicki and the two minor children need $5,859 per month, excluding her education expense and including income taxes, to meet their reasonable needs. "The support award . . . will enable Wife and the two minor children to enjoy substantially the same standard of living enjoyed by the family during the seven most recent years prior to the separation of the parties on January 1, 1986, which standard of living appears to have been supported on an average net income, including his annual bonus, of $6,000 per month, during a time when the family was comprised of six people . . . ."

On the question of Clyde's future bonus income, the court stated, "No future bonus is guaranteed. It would therefore not be appropriate to base a support order on Husband's bonus income and then require him to file motions to modify at such times as the bonus is reduced. It would be more fair to all parties to base the support order on Husband's income from

---

[6]Under the 1988 version of section 4801, subdivision (a), applicable here, the court was not required to determine the income tax consequences of the support award, and that information is not fully developed in the record. (See Stats. 1987, ch. 1086, § 2, pp. 3676-3677.) In Clyde's financial declaration admitted into evidence, he has estimated 1988 income tax liability after deducting interest and taxes on his home, but without excluding spousal support, from gross income. Without the spousal support exclusion, the mandatory deduction figure of $4,606 is distorted. It is, of course, usually difficult to compute income taxes accurately until the amount of support is determined.

salary and dividends, and to allocate a portion of the future bonus income to the children and to Wife by way of a percentage interest so that future litigation will not be necessary as the bonus income changes."

The court filed its order on the reserved issues on September 20, 1988, ordering Clyde to pay Vicki a total of $5,900 per month for herself and the two minor boys, allocating $3,000 to spousal support and $1,450 to each child. As additional spousal support, Clyde was ordered to pay to Vicki a sum equal to 15 percent of his annual gross cash bonus when received and 10 percent of his annual gross cash bonus as child support for each child. Child support continued until the respective child attained age 19 or ceased attending high school.

The court ordered an automatic step-down—all spousal support, both fixed and bonus percentage, was to be automatically reduced to $1 per year in three years—effective June 1, 1991, unless prior to that time, Vicki files a motion and shows good cause why the support order should be modified by demonstrating that she has made her best efforts to become self-supporting. Jurisdiction was reserved beyond June 1, 1991, to modify spousal support on a showing of changed circumstances.

Based on Clyde's stipulation, he was ordered to pay Vicki's school tuition, schoolbooks, and laboratory fees for the next three school years, with certain conditions about enrollment and reporting, and to maintain insurance on his life for the benefit of the children.

The court ordered Clyde to pay Vicki $10,000 out of the $35,000 she owed for attorney fees, after finding that her failure to enter into good faith settlement negotiations did not justify requiring Clyde to pay all fees incurred by her.[7]

Clyde concedes that each of the trial court's findings is supported by substantial evidence; he does not challenge the fixed spousal support of $3,000 per month or the fixed child support of $1,450 per month per child, for a total support order of $5,900 per month. He does challenge the provisions for escalation of support based on his future bonuses. Vicki does not appeal from the step-down order or the award of attorney fees.

---

[7]The court acknowledged Vicki's problems with continuous legal representation. Vicki was initially represented by W. O. Weissich, who died in November 1986. In December 1986, she retained Sylvia K. Shapiro, who subsequently was appointed a court commissioner. In January 1988, Vicki retained Mary Catherine Farley, who represented her in the negotiation and execution of a marital settlement agreement on March 31, 1988, and the amendment thereto on April 18, 1988, as well as in the bifurcated hearing on support, custody, and attorney fees.

## IV. *Section 4801 on Spousal Support*

Before enactment of the Family Law Act (Stats. 1969, ch. 1608, §§ 8, 37, pp. 3314-3344, 3351, operative Jan. 1, 1970), former section 139 (now § 4801) provided that an award of spousal support was within the discretion of the trial court upon consideration of the circumstances of the parties. By judicial interpretation, the circumstances included " 'practically everything which has a legitimate bearing upon the present and prospective matters relating to the lives of both parties.' (*Lamborn* v. *Lamborn* [1926] 80 Cal.App. 494, 499 [251 P. 943].)" (*Hall* v. *Hall* (1954) 42 Cal.2d 435, 442 [267 P.2d 249].) The court also had broad discretion in fixing the manner in which support could be paid, including a lump sum payment. (*Hall* v. *Superior Court* (1955) 45 Cal.2d 377, 385 [289 P.2d 431]; *Aarons* v. *Brasch* (1964) 229 Cal.App.2d 197, 202 [40 Cal.Rptr. 153].)[8]

The Family Law Act eliminated marital fault as one of the circumstances for the court's consideration and provided that the court could order either party to pay for the other party "any amount, and for such period of time, as the court may deem just and reasonable having regard for the circumstances of the respective parties, including the duration of the marriage, and *"the ability of the supported spouse to engage in gainful employment without interfering with the interests of the children . . . in the custody of such spouse."* (Stats. 1969, ch. 1608, § 8, p. 3333, italics added.) These specific circumstances, stressing the length of the marriage and the welfare of the children, had long been considered by the courts in awarding spousal support, and therefore the only substantive change was the elimination of fault. (*In re Marriage of Rosan* (1972) 24 Cal.App.3d 885, 892 [101 Cal.Rptr. 295]; see also *In re Marriage of Morrison, supra,* 20 Cal.3d at pp. 449-450; *In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 739, fn. 3 [145 Cal.Rptr. 205].) (Gender bias had been eliminated in 1951. (Stats. 1951, ch. 1700, § 7, p. 3912.))

In 1976, the Legislature amended section 4801, specifying additional circumstances that had regularly been considered by the courts, such as the

---

[8]But see *In re Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645, 666-667 [235 Cal.Rptr. 587], in which the court held that it was an abuse of discretion to give the husband the option of obtaining an immediate termination of the court's jurisdiction to modify support by paying in one lump sum the present value of the future spousal support payments where the marriage was of 24 years' duration and the wife was not yet fully self-supporting. We agree that such an order is unfair absent a finding that the supported spouse has the financial ability to be self-supporting. Professor Herma Hill Kay, however, has suggested in her article, *An Appraisal of California's No-Fault Divorce Law* (1987) 75 Cal.L.Rev. 291, 315-316, that a lump sum award would seem to be authorized by section 4801, subdivision (a)(1)(B), and would be an appropriate way of compensating the spouse who has suffered economic disadvantage while enabling the other spouse to attain economic self-development. See also Professor Carol S. Bruch's article, *The Definition and Division of Marital Property in California: Towards Parity and Simplicity* (1982) 33 Hastings L.J. 769, 854-855.

earning capacity and needs of each spouse, their obligations and assets, the age and health of the parties, and their standard of living; it added as a factor to be considered by the court "[*t*]*he time required for the supported spouse to acquire appropriate education, training, and employment*," and it reiterated that the court must consider "[a]ny other factors which it deems just and equitable." (Stats. 1976, ch. 130, § 5, p. 209, italics added.) In the 1979 amendment, the Legislature again recognized the plight of the homemaker by directing the court to take "*into account the extent to which the supported spouse's present and future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported spouse to devote time to domestic duties*." (Stats. 1979, ch. 912, § 1, p. 3140, italics added.)

In 1984, while the issue of including a party's education in the definition of community property was pending in our Supreme Court (see *In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 766-768 [209 Cal.Rptr. 354, 691 P.2d 1020]), the Legislature again amended section 4801 to provide that the court in awarding spousal support must consider "*the extent to which the supported spouse contributed to the attainment of an education, training, or a license by the other spouse*." It also enacted section 4800.3, clarifying that an education was not community property, but providing that "*nothing in this subdivision shall limit consideration of the effect of the education, training, or enhancement, or the amount reimbursed pursuant to this section, on the circumstances of the parties for the purpose of an order for support pursuant to Section 4801*." (Stats. 1984, ch. 1661, §§ 2-3, pp. 5979-5980, italics added.)

In 1986, the Legislature again amended section 4801, subdivision (a), by renumbering and expanding the factors that the court must consider in assessing the earning capacity of each spouse.[9] (Stats. 1986, ch. 1096, § 1.)

---

[9] In 1987 the Legislature again amended section 4801, adding to subdivision (d) a presumption that a marriage of 10 years or more was a marriage of long duration. The Legislature made no changes to subdivision (a) at that time. (Stats. 1987, ch. 1086, § 2, pp. 3676-3677.)

In 1988 the Legislature again amended subdivision (a), making substantive as well as numbering changes. Subdivision (a)(1)(C) is now subdivision (a)(2), which requires "the trial court to generally recognize the extent to which the working spouse contributed to the student spouses's [*sic*] attainment of an education, rather than considering this factor only with respect to the earning capacity of each spouse." (*In re Marriage of Watt* (1989) 214 Cal.App.3d 340, 353, fn. 8 [262 Cal.Rptr. 783].) "[T]he standard of living established during the marriage [is now] an overreaching reference point against which the court assesses the other spousal support factors. [Citation.]" (*Id.*, at p. 352, fn. 8.) A new factor is (9), the "immediate and specific tax consequences to each party." (Stats. 1988, ch. 407, § 1, No. 7 West's Cal. Legis. Service, p. 1063, No. 3 Deering's Adv. Legis. Service p. 1556.) Neither party has briefed the changes in section 4801 nor whether the amendments are retroactive. We therefore review the case under the statute in effect at the time of the hearing.

Thus, at the time of the hearing in May 1988, section 4801 provided in relevant part (with the 1986 changes underlined: "(a) . . . the court may order a party to pay for the support of the other party any amount, and for any period of time, as the court may deem just and reasonable. In making the award, the court shall consider all of the following circumstances of the respective parties:

"(1) The earning capacity of each spouse, taking into account the <u>following</u>:

"(A) The marketable skills of the supported spouse; the job market for those skills; the time and expenses required for the supported spouse to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment.

"(B) The extent to which the supported spouse's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported spouse to devote time to domestic duties.

"(C) The extent to which the supported spouse contributed to the attainment of an education, training, a career position, or a license by the other spouse.

"(2) The needs of each party.

"(3) The obligations and assets, including the separate property, of each.

"(4) The duration of the marriage.

"(5) The ability of the supported spouse to engage in gainful employment without interfering with the interests of dependent children in the custody of the spouse.

"(6) The age or health of the parties. [This was apparently a typographical error, which was corrected in 1988 back to the original "and." (Stats. 1988, ch. 407, § 1, No. 7 West's Cal. Legis. Service, p. 1063, No. 3 Deering's Adv. Legis. Service p. 1556.)]

"(7) The standard of living of the parties.

"(8) Any other factors which it deems just and equitable. . . ."

The various amendments to section 4801, subdivision (a), evidence the Legislature's increasing concern for the problems facing the "displaced homemaker" and its effort to balance the disparity between the limited earning capacity of one entering the labor market after years of devoting time to domestic and child-rearing activities and one with a fully developed career who, after separation, continues with enhanced earning capacity on an upward financial spiral.

## V. *The Award of Spousal Support*

 Clyde's main contention is that the order violates the established rule that spousal support is limited by the supported spouse's needs in order to continue living at the standard established during the marriage. He does not claim an inability to pay the fixed amount of support or the percentage of his bonus. He correctly points out that over the years the courts have emphasized the needs of the supported spouse and the ability of the supporting spouse to meet those needs among the circumstances to be considered in making the award. In many marital breakups, this emphasis on need and ability is necessary and realistic because the income and assets of the parties are not sufficient to maintain two households at the marital standard. We do not have that situation here.

Clyde cites four cases where the reviewing court found no error in the award of spousal support based on the wife's evidence of need, even though the husband was able to pay more: *In re Marriage of Slater* (1979) 100 Cal.App.3d 241, 249-250 [160 Cal.Rptr. 686]; *In re Marriage of Aufmuth* (1979) 89 Cal.App.3d 446, 458-459 [152 Cal.Rptr. 668], overruled on another ground in *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 815 [166 Cal.Rptr. 853, 614 P.2d 285]; *In re Marriage of Roesch* (1978) 83 Cal.App.3d 96, 103 [147 Cal.Rptr. 586]; *In re Marriage of Clark* (1978) 80 Cal.App.3d 417, 425-426 [145 Cal.Rptr. 602]. In each of these cases the reviewing court upheld the trial court's exercise of discretion based on substantial evidence. All of these cases, however, were decided before the 1979 amendments to section 4801, subdivision (a), took effect.[10] As noted above, the Legislature amended section 4801, subdivision (a), three times (in 1979, 1984, and 1986) between the prior versions applicable to the cited

---

[10]After the 1976 amendments, section 4801, subdivision (a), provided that the circumstances to be considered were: "(1) The earning capacity and needs of each spouse. [¶] (2) The obligations and assets, including the separate property, of each. [¶] (3) The duration of the marriage. [¶] (4) The ability of the supported spouse to engage in gainful employment without interfering with the interests of dependent children in the custody of the spouse. [¶] (5) The time required for the supported spouse to acquire appropriate education, training, and employment. [¶] (6) The age and health of the parties. [¶] (7) The standard of living of the parties. [¶] (8) Any other factors which it deems just and equitable." (Stats. 1976, ch. 130, § 5, p. 209.)

cases and the version of section 4801 applicable to the case before us. With each amendment the Legislature added additional factors that a court must consider in awarding spousal support to the homemaker or working spouse who enables a student spouse to acquire an education, training, a career position, or a license. Were we to focus only on need and ability, we would be ignoring the legislative commands enacted since the cited cases were decided.

Moreover, the Legislature's expansion and specification of the circumstances has been interpreted as a mandate to the trial court to consider and apply *each* circumstance before exercising its discretion in fixing the amount and duration of support and in determining whether jurisdiction to modify should be retained and, if so, the terms of the retention of jurisdiction. (*In re Marriage of Wilson* (1988) 201 Cal.App.3d 913, 920 [247 Cal.Rptr. 522]; *In re Marriage of Bukaty* (1986) 180 Cal.App.3d 143, 147 [225 Cal.Rptr. 492]; *In re Marriage of Fransen* (1983) 142 Cal.App.3d 419, 425 [190 Cal.Rptr. 885].)

■ Here, the trial court found that Vicki and the two minor children need $5,859 per month to meet their reasonable needs. The record does not include a breakdown of the data used by the court in reaching that figure. In determining the amount of support, however, the trial court is not required to have the particularity that it would be required to have where a creditor is suing on each item. (*Strohm* v. *Strohm* (1960) 182 Cal.App.2d 53, 57 [5 Cal.Rptr. 884].) The evidence supports a finding that this amount covered basic needs, but the record also reflects that many things such as inflation, obsolescence, repairs, and major vacation trips were not included. Indeed, Vicki testified that the 13-year-old household appliances needed replacement, that she would have additional expenses for commuting for upper division college courses, and that her parents had lent or given her money. Her aunt testified that she had provided Vicki with $700 for pool repairs, $2,400 for income taxes, and smaller sums for groceries and dining out. ■ The court was no doubt aware of Vicki's need for household help and child care expenses while finishing college and, later, during employment. Clyde incurred none of these expenses while on his career track because Vicki provided the services; he thought she would not need household help because she "does not work." But, she is entitled to the same accommodation—necessarily from outside sources—and such help should be considered an expense of acquiring her training and becoming a working mother. (§ 4801, subd. (a)(1)(A).) ■ In whatever manner the trial court computed the spousal support award, however, need is but one circumstance to be considered and must be weighed with the other circumstances. (*In re Marriage of Fransen, supra,* 142 Cal.App.3d at p. 425.)

Clyde's argument that spousal support cannot exceed the amount necessary to maintain the standard of living acquired during the marriage is similarly infirm. The standard of living is only one circumstance to be considered. (*In re Marriage of Watt, supra*, 214 Cal.App.3d at pp. 351-352.)[11] But even if it were the limiting factor in setting the amount of support, we would find it difficult to apply in this case. ■ The trial court used an average of the family's expenses over the seven years before the parties' separation on January 1, 1986 (1979-1985), to arrive at an average figure of $6,000 per month for the family of six. This is a distorted figure because it gives little or no weight to the upward mobility of the family. In 1985, the year before the separation, Clyde's fixed salary was $140,004, and the bonus earned the previous year, but not paid until 1985, was $75,000, for a total income in 1985 of $215,004, or $17,917 per month gross plus dividends. At the time of the hearing in 1988, Clyde's total gross income for the year was $300,000 in salary and bonus plus $18,500 in dividends, for a total of $26,542 per month. To leave the custodial parent and the two minor children at a significantly lower plateau of living while the noncustodial parent enjoys a significantly increased income is unjust. (§ 4801, former subd. (a)(8) [now subd. (a)(10)].) The trial court was well aware of this inequity when it stated, "I can't ignore the bonus income as you [Clyde] suggest . . . and that's being chintzy. I'll have to consider it."

■ Rather than looking only to need and standard of living, the trial court here considered all the circumstances and appropriately gave great weight to the factors set out in subdivision (a) of section 4801. We do not have to dwell long on the extent to which Vicki contributed to Clyde's attainment of an education and highly successful career position. She undertook all the domestic duties and, more importantly, was the prime caretaker for the four children of the marriage for 21 years while Clyde devoted time and effort to his career. As a result, he now has substantially enhanced earning capacity and a secure financial future, which admittedly benefits not only him but also the other family members.

The Legislature has directed the courts to consider "[t]he extent to which the supported spouse contributed to the attainment of an education, training, a career position, or a license by the other spouse." (§ 4801, former subd. (a)(1)(C) [now subd. (a)(2)]; see also § 4800.3.) In *In re Marriage of Watt, supra*, 214 Cal.App.3d at pages 349-351, the court analyzed these two

---

[11] See Hogoboom and King, California Practice Guide: Family Law (Rutter 1990) Support, sections 6:86.1-6:110, pages 6-96.16 —6-105, on the impact of the 1988 amendments to section 4801, subdivision (a), relating to the marital standard of living. "The intent is not to set a ceiling on the amount of support but, rather, to establish a *reference point* against which the 10 specific statutory guidelines may be weighed. [Citation.]" (*Id.*, § 6:86.1, at p. 6-96.16, original italics.)

sections and concluded that "the new legislative scheme afforded two remedies, as appropriate, in cases where one spouse worked to put the other through school: (1) reimbursement and (2) support." (*Id.*, at p. 350.) The court held "that in the case of a career threshold marriage where the working spouse provided a far greater share of living expenses while the student spouse acquired a professional degree, section 4801 requires the trial court to consider the totality of the nonstudent's contributions and efforts toward attainment of that degree, including contributions for ordinary living expenses." (*Watt, supra,* at p. 351.)

We interpret section 4801, former subdivision (a)(1)(C) (now subd. (a)(2)), as mandating that the unpaid homemaker who is the prime caretaker for the children of the marriage be given the same consideration for such substantial contributions to the spouse whose career has been fostered during the marriage. The trial court complied with the legislative mandate to consider the extent to which Vicki contributed to Clyde's career by awarding her a percentage share of his extra earnings for a period of time.

Vicki's economic future, on the other hand, is less certain. She has the capability to become a teacher and is in good health. But, she has suffered economic disadvantage to her career by an absence of 21 years from the paid work force, for which she should be compensated. (§ 4801, subd. (a)(1)(B); see Kay, *An Appraisal of California's No-Fault Divorce Law, supra,* 75 Cal.L.Rev. at p. 316.) Even if she can complete the work for her bachelor of arts degree and teacher's credential in three years, there is no assurance that she can find a beginning placement paying $36,000 a year, the amount needed to replace spousal support. Completing her training and finding employment are not her only problems. The career counselor noted Vicki's reluctance to deprive the two younger children of the nurturing she had provided the two older girls. Overcoming ambivalence about leaving children and acquiring confidence to enter the paid work force after a long absence are emotional hurdles that one who has started early on the career track can seldom appreciate. Easing financial worries can ameliorate some of the trauma to a woman who chose the traditional role of wife and mother only to discover that her expectation of future security would not be realized by this route. The trial court no doubt considered the expenses required for this transition and the development of Vicki's marketable skills. (§ 4801, subd. (a)(1)(A).)

Fortunately, Vicki has the abilities, health, and age to pursue another route. The Legislature has expressed an intention that supported spouses should be encouraged to become self-sufficient when able to do so. (§ 4801, former subd. (a)(5) [now subd. (a)(7)]; *In re Marriage of Morrison, supra,* 20 Cal.3d at p. 451.) This, of course, has long been the policy of the law. (*In re*

*Marriage of Rosan, supra,* 24 Cal.App.3d at p. 896, citing *Lamborn* v. *Lamborn* (1926) 80 Cal.App. 494, 498-499 [251 P. 943].) It is a sound policy. When the marriage is over, each party benefits by establishing a new life, rather than clinging to old memories and lost hopes. The trial court considered this circumstance by ordering a step-down in spousal support at the end of three years. Although the court's order is based on optimistic speculation rather than on solid evidence that Vicki will be able to support herself at that time, Vicki has not appealed from it. We therefore do not consider it except to say that if the order for a percentage of Clyde's bonus were reversed, we would feel compelled to reverse the step-down order. (See Code Civ. Proc., § 906; *In re Marriage of Garrity and Bishton* (1986) 181 Cal.App.3d 675, 690 [226 Cal.Rptr. 485] [where judgment becomes final against nonappealing party it may also be reversed in order to do justice when portions adverse to the nonappealing party are so interwoven with the whole appeal that one part affects the others].)

Clyde's remaining arguments have little merit. He claims that the court impermissibly speculated about Vicki's future needs by increasing her future support in advance. Given the court's speculation about Vicki's ability to be self-supporting in three years, this argument rings hollow. Clyde also claims that the additional support will be a disincentive for Vicki to become self-sufficient. We join in the speculation by guessing that her burden of proving to the court the reasons for being unable to find employment will provide her with incentive to become independent.

■ Although patterns in marital breakups emerge, each couple has such a diverse mix of circumstances that trial courts must have broad discretion in weighing and balancing the various factors in each particular marriage before making a suitable support award. A trial court will not be reversed absent an abuse of that discretion. An abuse "occurs when, after calm and careful reflection upon the entire matter, it can be fairly said that no judge would reasonably make the same order under the same circumstances." (*In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 114 [113 Cal.Rptr. 58]; *In re Marriage of Bukaty, supra,* 180 Cal.App.3d at p. 147.) Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders. (*In re Marriage of Aufmuth, supra,* 89 Cal.App.3d at p. 458.) ■ Here, the record reflects that the court weighed and considered each circumstance required under section 4801, subdivision (a), and the record supports the trial court's exercise of discretion. The court's balancing of factors is particularly evident when we consider the award of a percentage of the bonus and the step-down of support in three years. We find no abuse of discretion in the award of spousal support.

## VI. *The Award of Child Support*

Clyde was ordered to pay $1,450 per month per child for two minor children, Clyde III, who will turn 19 on July 20, 1993, when his support will end, and Joseph, who will turn 19 on February 22, 1998, when his support will end. Thus, Clyde's total support obligation for payment of a percentage of his bonus is 35 percent until June 1991, when the spousal support step-down provision goes into effect; 20 percent from 1991 until July 1993, when child support for Clyde III terminates; and 10 percent from July 1993 until February 1998, when child support for Joseph terminates. Except for the possibility of an extension of spousal support, Clyde thus has an automatic step-down in his support obligations. He does not object to the total fixed child support order of $2,900. Here, as with spousal support, he challenges only the court's order to pay 10 percent of his gross bonus for each child as additional support.

He contends that: (1) the court erred by exceeding the Judicial Council and Marin County guidelines for child support without basis and without making an adjustment for the 30 percent of time the children spend with him; (2) there was no evidence the children needed the additional amount; (3) by applying a mechanical percentage formula, the court failed to exercise discretion; (4) the court failed to assure that the children are the actual beneficiaries of the additional support; and (5) as a matter of public policy such large amounts of child support should not be awarded without a specific finding that it is in the children's best interests.

Both parents, of course, have an equal responsibility to support their children (§ 196, subd. (a)), and the court is authorized to "order either or both parents to pay any amount necessary for the support, maintenance, and education of the child. . . ." (§ 4700, subd. (a)(1).)

To remedy the long history of inadequate child support awards and guarantee that a minimum floor be set for such support, the Legislature enacted the Agnos Child Support Standards Act of 1984 (the Agnos Act). (Stats. 1984, ch. 1605, § 4, pp. 5664-5671.) The Agnos Act applies to all initial child support orders and to applications for modification of child support made after its effective date of July 1, 1985. (See generally Hogoboom & King, Cal. Practice Guide: Family Law, Support, *supra*, § 6:26 et seq., at p. 6-26 et seq.)

Although the Agnos Act provides for a mandatory minimum in child support, it also provides that "[u]pon the request of either party, the court may award and, when appropriate, is hereby urged to award a higher

amount of child support than the mandatory minimum child support award." (§ 4724.)

The Legislature stated that a basic tenet of the Agnos Act is that "[a] parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life." (§ 4720, subd. (e).) In setting a higher level of support, "the court shall be guided by the criteria set forth in applicable statutes, relevant case law, state and local child support guidelines not in conflict with the mandatory minimum award established by this chapter, and the legislative intent that children share in their parents' standard of living . . . ." (§ 4724, subd. (a).) To assist courts in those counties without support schedules or guidelines, the Legislature directed the Judicial Council to "develop schedules for discretionary child support awards above the mandatory minimum child support awards . . . ." (§ 4724, subd. (b); *In re Marriage of Hubner* (1988) 205 Cal.App.3d 660, 665-667 [252 Cal.Rptr. 428].) The Judicial Council has prepared such guidelines, but they are discretionary on both the amount and on an adjustment of support for shared custody. (*Hubner, supra,* at p. 667; § 4727.) Clyde concedes that the Marin County guidelines are also discretionary, not only on the amount of support but on an adjustment for time spent with each parent.

The Agnos Act provides in part that when a court is called upon to determine minimum child support and monthly child support payments, it must first compute the annual gross income of each parent. ". . . The annual gross income means income from whatever source derived . . . and includes . . . [¶] (1) . . . commissions, salaries, royalties, wages, *bonuses*, rents, dividends, pensions, interest, trust income, annuities, workers' compensation benefits [and the like]." (§ 4721, subd. (a)(1), italics added.) Thus the trial court has a clear statutory direction to consider the future bonuses of a parent in determining income for purposes of fixing child support.

In his pretrial brief, Clyde proposed that child support be set at $1,250 per month per child, for a total of $2,500, but he did not state reasons for urging this amount. At trial he sought to establish that the two boys were with him about 45 percent of the time and accordingly urged a downward adjustment in child support. Again, in his posttrial brief, he proposed child support of $1,250 per month per child without discussion. The record contains no request by Clyde to the trial court to consider the guidelines. If he had made such a request, the court would have been compelled under the Agnos Act to include the bonuses in Clyde's gross income before computing net income available for child support. Clyde's resistance to consideration of his bonuses in setting support no doubt influenced his decision to avoid the guidelines in the trial court. Now, on appeal he presents detailed

computations to support his claim that the court abused its discretion in failing to follow the guidelines. We decline to consider an issue not raised by him in the trial court, and therefore reject his claim that the court erred by exceeding the Judicial Council and Marin County guidelines for child support.

■ Clyde next claims that there was no evidence that the children needed the additional support and that the court, by applying a mechanical formula of 10 percent of his bonuses per child, failed to exercise any discretion. We disagree.

Both parties presented the spousal and child support issues as a single issue—the total amount needed for Vicki and the two minor children. At the hearing Clyde tried to prove that the children spent almost half of their time with him, rather than focusing on their actual expenses. Five income and expense declarations were prepared for Vicki by her various attorneys, with monthly expense figures ranging from $11,502 to $6,014. Some of the declarations obviously had inaccurate figures; others contained minimum figures such as $378 per month for food. Clyde offered into evidence an exhibit comparing these declarations, but the only figures relating solely to child support were for child care. Vicki testified that Clyde had always handled the monthly accounts except for clothing and food and that she had not understood or helped in the preparation of her earlier income and expense declarations. Her declaration filed for the hearing showed $10,817 for her total monthly expenses. Clyde, of course, challenged that figure. He asserted that her actual 1987 expenses were $5,521 and proposed in his posttrial brief spousal support of $3,050 and child support of $2,500. In her posttrial brief, Vicki, using only Clyde's earnings from employment, $311,280, computed spousal support at $7,172 and child support at $3,498 as consistent with the guidelines. Vicki testified that both boys were involved in many sports and particularly liked to go on ski weekends, which she had been unable to afford. She did not want to leave them alone without child care because the older boy picked on the younger one. Vicki, of course, is entitled to use a portion of the support to defray the expense of maintaining the family home for the benefit of the children.

Overall, there was sufficient evidence for the court to determine approximately what the needs were and would be for boys of about nine and fourteen years of age. "Determining the amount comes within the rule that the trier of fact may fix a reasonable sum where the matters are nontechnical in nature and of common knowledge. [Citations.]" (*Strohm* v. *Strohm*, *supra*, 182 Cal.App.2d at p. 57.) The court could call on its own knowledge of such things as inflation, the cost of car insurance for male teenaged

drivers, the cost of major vacation trips, and allowances as the boys aged, as well as the increased cost of their food and clothing.

Neither party asked for specific findings on the amount needed for child support. (See Code Civ. Proc., § 634.) Nor did they avail themselves of section 4700, subdivision (a)(1), which provides in part that "[a]t the request of either party, the court shall make appropriate findings with respect to the circumstances on which the order for the support of a minor child is based. . . ." Thus, in the absence of specific figures, we assume the trial court determined the reasonable needs of the two minor children, taking into consideration their right to share in their father's higher standard of living. The principles set forth by the Legislature in the Agnos Act make it very clear that the child is entitled to share his or her parents' standard of living. (§§ 4720, subd. (e), 4724, subds. (a), (b); *In re Marriage of Hubner, supra,* 205 Cal.App.3d at pp. 667-668; *In re Marriage of Catalano* (1988) 204 Cal.App.3d 543, 552 [251 Cal.Rptr. 370]; *White* v. *Marciano* (1987) 190 Cal.App.3d 1026, 1032 [235 Cal.Rptr. 779].) The trial court followed this mandate.

■ Clyde's arguments that the court failed to assure that the children were the actual beneficiaries of the support and that the court should be required to make a finding that the large amount of support was in the children's best interests are intertwined. Both arguments assume that Vicki is irresponsible about teaching the children values and that she cannot be trusted to manage the child support for the benefit of the children. We find nothing in the record to support those assumptions. It is also apparent that if Clyde had been willing to consider his bonuses in determining the amount of support, he may very well have had a greater say in the purposes for which the child support is to be spent.

■ The amount of child support rests in the sound discretion of the trial court, and an appellate court will not interfere with the trial court order unless as a matter of law an abuse of discretion is shown. (*In re Marriage of Aylesworth* (1980) 106 Cal.App.3d 869, 876 [165 Cal.Rptr. 389].) Here, we find no such abuse in the award of child support.

## VII. *Conclusion*

It is worth remembering the oft repeated statement that a husband and wife can sever their marital status but can never sever their status as parents. Unless they retreat into bitterness and acrimony, they will continue to have many contacts: high school and college graduations, weddings, grandchildren, and sharing of holidays. It is only fair to their children for each parent to work toward resolving the social, psychological, and economic

disruptions attendant on the marital breakup so that their continued sharing of parental responsibilities will benefit the children in a reorganized family pattern. If each parent goes his or her own way, unaware of or refusing to accept these responsibilities, the children will be forever stranded in the middle, often unable to resolve the conflict in loyalties and unsure of their status with each parent. Fortunately, in this family, the parents have already exhibited a concern and willingness to accommodate each other for the benefit of the children.

It is also worth remembering that in any family a great disparity between the living standards of the parents will not go unnoticed by the children, and they will be quick to discern any unfairness that caused it. With this family, we think the trial court was aware of addressing the potential for disruption caused by this disparity when it provided incentive for Vicki to develop her own skills and career yet gave her a cushion in the transition period and during the years that she would continue as the prime caretaker of the two minor children. Our Supreme Court has stated that circumstances include " 'practically everything which has a legitimate bearing upon the present and prospective matters relating to the lives of both parties.' [Citation.]" (*Hall* v. *Hall, supra,* 42 Cal.2d at p. 442.) The Legislature has mandated a trial court to consider "[a]ny other factors which it deems just and equitable," which certainly includes the future circumstances of the parties. (§ 4801, former subd. (a)(8) [now subd. (a)(10)].) The court considered and weighed the prospective matters as well as each of the present circumstances of the parties as specified in section 4801, subdivision (a), and properly applied each factor. It considered the mandate of the Agnos Act that children are entitled to share in the increased standard of living of the parents. We find no abuse of discretion.

The order is affirmed. Respondent (Vicki) shall recover her costs on appeal. Her request for an award of attorney fees on appeal is an issue more properly addressed to the trial court. (See Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* § 16:190.4, at pp. 16-76—16-77.)

White, P. J., and Strankman, J., concurred.