Filed 9/10/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of JILL A. and MITCHELL PLETCHER. | |
| JILL A. PLETCHER,<br><br>    Respondent,<br><br>        v.<br><br>MITCHELL PLETCHER,<br><br>    Appellant. | G059134<br><br>(Super. Ct. No. 18D006405)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Donald F. Gaffney, Judge. Reversed and remanded.

Mitchell Pletcher, in pro. per.; Law Offices of Saylin & Swisher, Brian G. Saylin and Lindsay L. Swisher for Appellant.

Law Offices of Lemkin, Barnes & Row and Cheryl Anne Row for Respondent.

\*          \*          \*

1

This is an appeal from a family law order setting pendente lite spousal support. Appellant Mitchell Fletcher operates an investment management business. His income fluctuates considerably from year to year depending on the performance of the market. In this scenario, *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075 holds that a court must calculate future income based on a representative sample of past income. Instead of doing that, the trial court here forecasted Mitchell's future income based on the most recent year of historical income, which happened to be Mitchell's best year ever by a wide margin.[1] Given the nature of his income structure, however, it is unlikely that Mitchell will repeat such a year. This is because he has a somewhat unusual setup: for many of his clients, he gets paid based on the increase in value of their portfolios. In order to get paid, therefore, he must exceed the highest value that the asset portfolio has recorded under his management. After such a banner year, he is unlikely to see an equivalent increase in the overall value of the assets he manages. Indeed, in the recent past, Mitchell had made as little as one-third of the amount the court based its calculation on. Accordingly, the court abused its discretion in calculating his prospective income on an unrepresentative sample period.

In addition to managing investments, Mitchell and Jill started a theater company. In calculating Mitchell's income, the court did not consider any losses from the theater company on the ground that the theater was not "related to" the investment business. We agree with Mitchell that the court employed the wrong legal standard in conducting that analysis. The error, however, was harmless because Mitchell did not identify any prospective theater expenses that would impact his income going forward. Nevertheless, because this issue may recur in this case, we set forth the proper legal standard below.

---

[1] For the sake of clarity, and not out of disrespect, we refer to the parties by their first names.

FACTS

Jill filed for divorce in July 2018 after a marriage of almost 35 years. There were no minor children at the time. Shortly after, in September 2018, Jill filed a request for order (RFO) seeking pendente lite spousal support, attorney fees and costs, and forensic accountant fees and costs. Only the request for pendente lite spousal support is at issue in this appeal.

In the years preceding the divorce, the parties' income came almost entirely through Concord Investment Council doing business as Mitchell Anthony Capital Management (the Investment Firm). The Investment Firm was owned by Mitchell. Mitchell was the face of the operation and managed the clients' assets (approximately $250 million), while Jill did the bookkeeping. The Investment Firm was primarily paid in one of two ways: either an annual fee of 1 percent of the value of the assets under management, or 10 percent of the increase in value of the assets under management. About half of the Investment Firm's clients had opted for the profit-based approach. In those cases, the Investment Firm would only get paid if the value of the assets exceeded their historic highs. To avoid double taxation, the Investment Firm paid out most of its annual profits to Mitchell in the form of a bonus.

Mitchell took an annual salary of $240,000, but in most years his income primarily consisted of his bonus, which was paid annually at the end of March. The amount of the bonus depended heavily on whether he was able to increase the value of his assets under management. The W2 income (which included salary and bonus) taken by Mitchell since 2014 was as follows: 2014: $1,130,000; 2015: $540,000; 2016: $490,000; 2017: $505,000; 2018: $1,097,000; 2019: $1,590,000.

While Jill was employed by the Investment Firm, she took an annual salary of $200,000. She was fired in December 2018, which the court found was simply due to

vindictiveness on Mitchell's part.  She remained unemployed through the trial on her RFO.

The trial on Jill's RFO primarily revolved around the parties' competing forensic accounting experts on the issue of Mitchell's ability to pay, which was complicated by the fact that Mitchell owns multiple businesses and has a volatile income. Jill's expert offered a few different analyses, but the methodology that the court ultimately found persuasive was simply to plug Mitchell's actual 2019 income ($132,500 per month) into the DissoMaster software program, which yielded a support payment of approximately $31,000 per month.[2]

Mitchell's expert's analysis, which the court ultimately rejected, differed in two fundamental ways.

First, Mitchell's expert utilized an average of Mitchell's income since 2008, which he calculated to be approximately $58,000 per month.  The court was unimpressed with this approach, describing it as "an obvious and unpersuasive attempt to lower the income available for support by going far enough back in time to bring in the period of the great recession that began around 2008."

Second, in analyzing Mitchell's historical income, his expert deducted approximately $770,000 over the course of three years that Mitchell had spent in building a theater that he intended to use to put on live performances.  In addition to the Investment Firm, Mitchell owns several other entities, one of which simply owns the building that houses the Investment Firm, and others of which revolve around Mitchell's attempt to break into the field of live entertainment.  To that end, he spent hundreds of thousands of dollars creating and furnishing a theater in the building that houses the Investment Firm.  The theater business had been incurring losses since 2012.  The court

---

[2] DissoMaster is a computer software program used by courts to calculate support.

4

rejected these deductions, finding that the theater business was not "related to" the Investment Firm.

Ultimately, the court awarded ongoing pendente lite spousal support of $31,717 per month which, since the hearing had dragged on for 15 months, resulted in arrears of $474,140. The court also awarded attorney fees to Jill in the amount of $250,000 (which is not at issue on appeal).

Afterward, Mitchell filed a motion for reconsideration, asking (for the first time) that the court employ an *Ostler/Smith* component in the temporary spousal support award to account for the volatility of his income. (See *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33.) Mitchell filed a declaration stating he only received a $350,000 bonus during 2019 compared to the $1.35 million bonus the court based calculation on. He did not expect to receive a bonus in 2020 due to the Coronavirus. Mitchell also claimed Jill had found a job that paid $110,000 per year, plus 401k contributions, and an annual bonus.

Prior to the motion being decided, Mitchell filed a notice of appeal from the pendente lite spousal support order.

The court heard argument on the motion and denied it on the ground that Mitchell had not presented new facts or evidence pursuant to Code of Civil Procedure section 1008.

DISCUSSION

Mitchell contends the court erred in two ways in calculating his available income. First, he contends the court erred in basing his ability to pay on a single year of income that happened to be by far his best year ever, when his income varies wildly from year to year. Second, he contends the court erred in disregarding the money he invested, and the losses he incurred, in the theater business in assessing his ability to pay.

5

*Legal Principles*

"During the pendency of any proceeding for dissolution of marriage . . . , the court may order . . . either spouse to pay any amount that is necessary for the support of the other spouse . . . ." (Fam. Code, § 3600.) "Temporary spousal support is awarded under [Family Code] section 3600. It is based on the supported spouse's needs and the other spouse's ability to pay. [Citation.] '"Whereas permanent spousal support 'provide[s] financial assistance, if appropriate, as determined by the financial circumstances of the parties after their dissolution and the division of their community property,' temporary spousal support 'is utilized to maintain the living conditions and standards of the parties in as close to the status quo position as possible pending trial and the division of their assets and obligations.' [Citations.]" [Citation.] The court is not restricted by any set of statutory guidelines in fixing a temporary spousal support amount.'" (*In re Marriage of Samson* (2011) 197 Cal.App.4th 23, 29, fn. omitted; see *In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 166.) "Temporary support . . . usually is higher than permanent support because it is intended to maintain the status quo *prior* to the divorce." (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 522.)

"The trial court has broad discretion to determine the amount of temporary spousal support, considering both the supported spouse's need for support and the supporting spouse's ability to pay." (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1442.)

*Mitchell's Income*

We begin with Mitchell's contention that the court erred in calculating his prospective income based on a single year of historical income. In calculating Mitchell's income, the trial court's approach was simple: take the last 12 months of income, run it through the DissoMaster software program, and award the program's recommendation. Generally, there is nothing wrong with that approach. As one court commented with

6

regard to standard guidelines, "The use of such guidelines 'should be encouraged to help lawyers and litigants predict more accurately what temporary support order would be issued if the case proceeded to a contested hearing. . . . They promote consistency in the temporary orders issued in a department with a busy domestic relations motion calendar, and are especially valuable in achieving comparable orders under similar financial facts . . . .'" (*In re Marriage of Winter* (1992) 7 Cal.App.4th 1926, 1933; see *In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 5, fn. 3 [the benefit of the software program is that it enables a "family law judge to input appropriate factual information about the income of the parties and have temporary spousal support computed in accordance with local rules, automatically taking into account the tax consequences of the order to each party"].)

The ultimate yardstick, however, is still a party's ability to pay, and a computer program is only as good as the data it is fed. (See *In re Marriage of Fini* (1994) 26 Cal.App.4th 1033, 1043 [observing, in the context of child support, that a court "is not just supposed to punch numbers into a computer and award the parties the computer's result without considering circumstances in a particular case which would make that order unjust or inequitable"]; *In re Marriage of Olson, supra,* 14 Cal.App.4th at p. 5 fn. 3 ["There are dangers in the use of a computer program, even when used only for temporary spousal support"].) Here, the result of the DissoMaster calculation was illusory because the input—Mitchell's income—was improperly calculated.

The inquiry into a party's ability to pay is prospective in nature. Although the evidence is necessarily historical, the court is attempting to forecast what the party will be able to pay as the litigation progresses. In most cases, this is not particularly challenging. A review of the payor's income over a 12-month period is normally adequate, as most people's income does not fluctuate dramatically from year to year. (*In re Marriage of Riddle, supra,* 125 Cal.App.4th at p. 1083 ["as regard [to] support, we

7

may say that statutes appear to create a presumption that the most recent 12 months is certainly *an* appropriate period in most cases"].)

Mitchell, however, is not most people. The evidence was clear and undisputed that Mitchell's income varied wildly from year to year. Between 2014 and 2019 he made, on the low end, $490,000 in a year, and on the high end, $1,590,000. Moreover, the evidence was clear as to why this was the case; for his profit-based clients, he had to beat his previous high watermark in order to make any money.

For this reason, it was error to conclude that having earned $1,590,000 in 2019, Mitchell would continue making that amount throughout the remainder of the litigation (which, if the *temporary* spousal support hearing is any indication, could go on for many years). As another panel of this court once cautioned, "'The theory is that the court is trying to predict *likely* income for the immediate *future*, as distinct from extraordinarily high or low income in the *past*.' [Citation.] We must be wary of 'the logical fallacy of extrapolation, in which some series of events in the past is necessarily assumed to continue in exactly the same way into the future.'" (*In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375, 1386.) The court ran afoul of these principles.

The court made essentially the same error that was reversed in *In re Marriage of Riddle*, *supra*, 125 Cal.App.4th 1075. That case likewise involved an order of pendente lite spousal support from a husband whose income fluctuated due to monthly sales commissions. (*Id.* at pp. 1077-1078.) The trial court had utilized a sample size of just two months in calculating support payments. (*Id.* at p. 1078.) Had the trial court used a full 12 months, the income would have been approximately 38 percent of the trial court's two-month calculation. (*Id.* at p. 1079.) The court held this was error. It reasoned that "the time period on which income is calculated must be long enough to be *representative*, as distinct from *extraordinary*." (*Id.* at p. 1082.) The *Riddle* court held that a 12-month period is "*an* appropriate period in most cases" (*id.* at p. 1083), but acknowledged that "[a] longer period could"—and we say *should*—" be conceivably

8

used . . . *if* it were more representative of a party's income" (*id.* at p. 1084). Here, due to the significant fluctuation in Mitch's income from year to year, we encounter a case that required a longer time period to generate a representative sample.

*Riddle* relied heavily on the case *In re Marriage of Rosen* (2002) 105 Cal.App.4th 808 (*Rosen*), a case where, like the present case, one year's worth of income did not provide a representative sample. The issue in *Rosen* was slightly different than the issue here, though the rationale is equally applicable. There, in dividing the community property, the court was required to calculate the value of the goodwill in husband's law practice. (*Id.* at p. 814.) His income fluctuated, and over the previous three years his income had been as low as roughly $71,000 per year, and as high as roughly $139,000. (*Id.* at pp. 819-820.) In calculating the goodwill of the business, the court relied on wife's expert's testimony, who utilized the highest income figure. The Court of Appeal reversed, concluding the court had failed to calculate the *average* income: "A reasonable trier of fact could not help but conclude the expert chose to use [husband's] net income from 1995—one of [husband's] highest earning years—solely to inflate the value of goodwill." (*Id.* at p. 820.) "*Picking one year's net income, where income rises or falls from year to year, is not a reasonable basis for determining value.*" (*Id.* at p. 821, italics added.)

Likewise, here, Mitchell's income fluctuates, and the court abused its discretion in calculating his average income based on a single year of income, which happened to be his highest grossing year on record.

For purposes of guiding the parties and the court on remand, we suggest two possible approaches the court might take.

First, it could expand its data set to include additional years that capture the volatility in Mitchell's income. We are sympathetic to the fact that the court here was confronted with expert testimony on opposite extremes. On the one hand, Mitchell's expert based his recommendation on income data going all the way back to 2008. The

9

court reasonably concluded that incorporating the years of the great recession artificially depressed Mitchell's income. On the other hand, Jill's expert swung to the opposite extreme; he incorporated only one year of data, which artificially exaggerated Mitchell's income. The underlying premises of both expert opinions were unreliable. In such circumstances, the court's equitable duty is to issue a support award based on its own determination of what constitutes a representative time period for calculating income, to the extent the underlying evidence permits it. (See *In re Marriage of White* (1987) 192 Cal.App.3d 1022, 1026 [noting that "spousal support is a consideration of equity"]; *Darsie v. Darsie* (1942) 49 Cal.App.2d 491, 494 ["A divorce action is in the nature of an action in equity"].) Under the specific circumstances of this case, for example, incorporating five years of income data would have been one option within the court's discretion.

The second option is to employ a tool well suited for this scenario: a *Smith/Ostler* component to the support award. (See *In re Marriage of Ostler & Smith*, *supra*, 223 Cal.App.3d 33.) "An *Ostler & Smith* percentage is assessed . . . for 'any discretionary bonus actually received.' [Citation.] It was originally justified on the ground that future bonuses are not guaranteed, and it would be unfair to require the obligor to file motions for modification every time a bonus is reduced." (*In re Marriage of Samson* (2011) 197 Cal.App.4th 23, 27.) That would allow the court to establish a base level of spousal support in reliance on the $240,000 Mitchell reliably earned each year, plus add a percentage of Mitch's annual bonus up to the amount necessary to maintain the marital standard of living. This approach would obviate much of the need for the court to forecast Mitchell's income, relying instead on the amount actually earned.[3]

---

[3] We recognize this case presents a unique challenge in that, unlike the usual bonus situation, Mitchell controls the bonus amount his company pays him. However, should the court elect to utilize a *Smith/Ostler* component, it can issue appropriate orders

Accordingly, we will remand for the court to recalculate temporary spousal support.[4]

*Theater Losses*

Next, Mitchell contends the court erred in excluding the losses his theater business incurred in calculating his take home income. At the outset, we note that any such error was harmless. All of the theater expenses Mitchell identified were one-time expenses related to building out the theater, which is now complete. Because temporary support is concerned only with prospective income, those one-time expenditures are irrelevant. Moreover, Mitchell has not identified any ongoing expenses associated with the theater. Nevertheless, because this issue may recur in this case, we will address how the court should analyze theater losses.

The court's approach here was to analyze whether the theater business was "related to" the Investment Firm. It is unclear to us what authority the court relied on for that legal standard, but there is some indication the court was relying on *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626 (*Sorge*). *Sorge* arose from an award of child support. After selling his interest in a company for over $100 million, the ex-husband formed a number of startup companies. (*Id.* at p. 635.) As a result, his net monthly income was negative when accounting for his investments and losses, though he earned about $225,000 per month in dividends and interest (*id.* at p. 634) and retained over $60 million in assets (*id.* at p. 637). The trial court declined to include the business losses

to ensure that Mitchell continues to pay his bonus consistent with his historical practice.

[4] To assist the court on remand, we offer two additional observations. First, although we have set forth what we view as the two most straightforward options as to how to calculate Mitchell's ability to pay, our opinion in no way limits the court to these options. Second, we do not hold that the *amount* of spousal support awarded is per se erroneous. The error was in the methodology employed. A sound methodology may (or may not) yield a similar award.

11

in calculating his income, and the ex-husband appealed. (*Id.* at p. 636.) The Court of Appeal affirmed on the ground that Family Code section 4058, which governs child support, permits a court to either calculate income, or calculate "earning capacity." (*Sorge*, at pp. 644-645.) This gives the court the option to impute income to a party, which the court has discretion to do if it is in the best interests of the child. (*Ibid.*) Using the alternate approach was within the trial court's discretion because "considering [the ex-husband's] actual monthly income would not reflect the true nature of the parties' relative lifestyles and wealth." (*Id.* at p. 648.)

Nowhere in *Sorge* do we find authority for the principle that losses from a business can be excluded if they are not "related to" a primary business. Nor do we view that as a workable legal standard. "Related to" is about as vague a standard as we can imagine. What relation, exactly, is meant? The Investment Firm and theater business are related to each other in the sense that they have the same owner. Presumably that is not what the court meant in this case. Assuming the court meant something like the businesses are complimentary to one another, it is not clear what policy goal that advances. Why does it matter if the businesses are in the same industry or completely unrelated industries? If they were both profitable, we undoubtedly would consider all of the profits as income available for support. It is not clear to us why losses should be any different.

Instead, the principal lesson from *Sorge* is that where business expenses create a distorted picture of a party's ability to pay support, the court may impute income to offset those expenses. In *Sorge*, the husband reported a negative monthly income, brazenly suggesting that he should *receive* child support payments, when in fact he was fabulously wealthy. (*Sorge, supra,* 202 Cal.App.4th at p. 644.) The theater losses at issue here do not bear any resemblance to that fact pattern. The theater business was started in 2012 and had been incurring losses from the outset. Rather than obfuscating Mitchell's wealth, losses associated with the theater business were a normal part of the

12

parties' marital standard of living and were written off on the parties' joint tax returns (which Jill prepared) as business expenses.

Rather, we conclude the cases *In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438 (*Blazer*) and *In re Marriage of Deluca* (2020) 45 Cal.App.5th 184 (*Deluca*) are more applicable.

*Blazer* was an appeal from an order modifying temporary spousal support and awarding permanent spousal support. (*Blazer*, *supra*, 176 Cal.App.4th at p. 1440.) The wife appealed, arguing that the court erred in excluding from husband's income certain business investments, which had the overall effect of lowering his income. (*Id.* at pp. 1440-1441.) Husband had testified that he needed to make the investments to change the way he did business because essentially, his business was the middleman in an industry that was cutting out the middleman. If he did not expand the business, he would go out of business. (*Id.* at p. 1444.) Noting that this was an issue of first impression (*id.* at p. 1447), the court affirmed the decision to exclude the investments from the husband's income (*ibid.*).

Although *Blazer* did not articulate a legal standard for analyzing business expenditures, the facts here bear some analogy in that Mitchell's undisputed testimony was that the Investment Firm likewise faces an existential threat: the average age of his clients was 82 years old, and his client base was literally dying off. According to Mitchell, the theater business addresses that issue in two ways: (1) it is an independent source of income; and (2) it creates the possibility of establishing connections in the live-entertainment industry that could generate clients for the Investment Firm.

*Deluca* picks up where *Blazer* left off and set forth a concrete legal standard. *Deluca* involved an appeal from an order setting permanent spousal support. (*Deluca*, *supra*, 45 Cal.App.5th at p. 187.) The husband had a monthly average income of $25,000, which included income from selling insurance as well as rental income. (*Id.* at p. 192.) After making loan payments on the rental properties, however, his

13

monthly income was around $7,000.  (*Id.* at p. 194.)  The trial court awarded spousal support of $7,500, concluding the mortgage payments simply added to his net worth and thus could not be deducted from his income.  (*Id.* at pp. 192-193.)

The Court of Appeal reversed.  Noting that "California case law provides little help in addressing this issue" (*Deluca*, *supra*, 45 Cal.App.5th at p. 195), the court interpreted *Blazer, supra*, 176 Cal.App.4th 1438, as standing for the proposition that "reasonable business expenses may be properly excluded from a spouse's business income in determining income available for spousal support." (*Deluca*, at p. 196.)  With regard to business debts, specifically, the *Deluca* court reviewed out-of-state cases to arrive at the following standard:  "Although such principal payments may increase an obligor spouse's net worth, a trial court retains the discretion to deduct a payment from income available for support if it finds, based on substantial evidence, that the payment reasonably and legitimately reduces the spouse's net income available for support, considering the totality of the relevant circumstances, including the extent to which the payment constitutes an ordinary and necessary business expense and whether disallowing the deduction would work a substantial hardship on the payor spouse." (*Id.* at p. 199.)

This standard works equally well in the context of business expenditures other than debt payments.  The question is not whether the businesses are related, but instead whether the expenditures were reasonable, and whether including or excluding them from income would work a hardship on either party.  In making this assessment, so long as any factual underpinnings for the ruling are based on substantial evidence, the ultimate determination of whether to include business investments is entrusted to the court's discretion.

14

DISPOSITION

The order setting pendente lite spousal support is reversed.  The matter is remanded for the court to recalculate pendente lite spousal support consistent with this opinion.  Mitchell shall recover his costs incurred on appeal.


MARKS, J.*

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.

*Judge of the Orange Super. Ct., assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.