Filed 6/23/23  Marriage of Winter CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of ADRIA WINTER and PACIFIC WINTER. | |
| ADRIA OTTOBONI, Respondent, v. PACIFIC WINTER, Appellant; DEPARTMENT OF CHILD SUPPORT SERVICES, Intervener and Respondent. | F083824 (Super. Ct. No. S-1501-FL-597161) **OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Dawn Bittleston, Judge.

Law Offices of Ira L. Stoker, Ira L. Stoker, for Appellant.

Borton Petrini, Edward Gordon and Diana L. Christian, for Respondent.

Rob Bonta, Attorney General, Cheryl L. Feiner, Senior Assistant Attorney General, Gregory D. Brown and Ricardo Enriquez, Deputy Attorneys General, for Intervener and Respondent.

-ooOoo-

Pacific Winter appeals from the family court's orders in this child support matter. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Pacific Winter and Adria Ottoboni (previously known as Adria Winter) were married on June 1, 1996, and separated on January 28, 2006. During the marriage, they had four children, born respectively in 1997, 1998, 2002, and 2003. On March 7, 2006, Ottoboni filed a petition for dissolution of marriage, with minor children. Judgment of dissolution was entered on April 14, 2008. Pursuant to the judgment, the parties had joint legal custody and joint physical custody of their children, and Ottoboni was obligated to pay spousal support ($1,000 monthly) and child support ($2,294 monthly) to Winter.

### *Child Support Orders of November 5, 2010, January 14, 2011, and March 11, 2011*

On November 7, 2008, Winter filed an order to show cause requesting modification of child support, and attorneys' fees. In a declaration attached to the order to show cause, Winter addressed Ottoboni's earnings as an emergency room physician. Winter declared: "Dr. [Ottoboni] is employed by a medical group commonly known as Kern Emergency Physicians. Through that medical group, Dr. [Ottoboni] works for Kern Medical Center. She is paid *separately* by Kern Emergency Physicians and Kern Medical Center." Winter indicated the family court's prior child support determination was based only on Ottoboni's earnings from Kern Medical Center and did not encompass her earnings from Kern Emergency Physicians. Winter further declared: "At the time that this Court calculated Dr. [Ottoboni's] support obligations to me, my attorney calculated her income to be $19,451.41 per month. Since then, I have been informed that Dr. [Ottoboni] has become a partner with her medical group and her income is now over $300,000 per year." Winter concluded: "At this time, I respectfully ask that this Court calculate Dr. [Ottoboni's] guideline child support obligation to me pursuant to the child support guidelines that are set forth in California Family Code Section 4055."

2.

Ottoboni filed a responsive declaration to the order to show cause on April 6, 2009. In her declaration, she stated: "The declarant has always disclosed all documentation regarding her income from all sources." She continued: "The declarant has never objected to guideline support." She added: "The declarant earns approximately $20,243.00 each month and not 'over 300,000.00 per year' as stated by [Winter]." Subsequently, Ottoboni submitted a letter from Kern Emergency Physicians' CPA, dated April 30, 2010, stating that as of March 2010, Ottoboni's earnings from Kern Emergency Physicians had declined and were projected to be $9,500/month or $114,000/year. In an income and expense declaration filed on May 13, 2010, Ottoboni listed $8,432 in monthly salary from Kern Medical Center and $9,500 in monthly income from Kern Emergency Physicians.

The family court, Commissioner James L. Compton, held several hearings on Winter's order to show cause, with the final hearing held on November 1, 2010, following which the matter was submitted. The family court issued a concise ruling on November 5, 2010. The court's order stated: "The court orders that [Ottoboni] pay [Winter] child support of $4,344 per month commencing January 1, 2009, and $3062 per month commencing January 1, 2010 ($401, $533, $763 and $1,364 for the children respectively, see the attached dissomaster worksheet). [Ottoboni] shall as additional child support pay on gross amounts she receives above $114,000, pursuant to the attached schedule, annually from Kern Emergency Physicians, to be paid within 10 days of receipt along with proof of the amounts received." The dissomaster worksheet for 2010, attached to the court's ruling, listed Ottoboni's total monthly income as $18,635 (broken down as $9,135 in monthly *salary* from Kern Medical Center plus $9,500 in monthly *self-employment income* from Kern Emergency Physicians). The court's order contained an additional sentence: "[Ottoboni] shall pay [Winter], … spousal support of $2,500 per

month to commence on January 1, 2009[,] based upon the parties['] respective needs, abilities and standard of living."

Thereafter, Winter's attorney sent a letter dated January 6, 2011, to the court, i.e., Commissioner Compton. The letter stated: "On November 5, 2010, my office received a Minute Order from Your Honor in the above-referenced matter in which Your Honor made certain child and spousal support orders in this case.… [¶] If Your Honor reviews the file in this matter, you will see that the Order to Show Cause filed by my office in this matter was requesting modification of child support and attorney's fees and costs. In the Minute Order, however, Your Honor inadvertently did not make any rulings regarding attorney's fees and costs, but did make a spousal support order which was not requested. Although Mr. Winter and I both appreciate Your Honor's spousal support ruling, the Court did not have jurisdiction over that issue. At the same time, the Court did not address Mr. Winter's request for attorneys' fees and costs to be paid by Dr. [Ottoboni]." Winter's counsel requested the court to issue an amended ruling that would "remove the spousal support ruling *and* rule on [the] request for attorneys' fees and costs." (Emphasis in original.)

On January 14, 2011, Commissioner Compton issued a "corrected ruling" with respect to his earlier November 5, 2010 ruling. (Unnecessary capitalization omitted.) The corrected ruling was *identical* to the November 5, 2010, ruling as to the court's child support order. Thus, the corrected ruling provided: " 'The court orders that [Ottoboni] pay [Winter] child support of $4,344 per month commencing January 1, 2009 and $3,062 per month commencing January 1, 2010 ($401, $533, $763 and $1,364 for the children respectively, see the attached dissomaster worksheet). [Ottoboni] shall, as *additional child support*, pay on gross amounts she receives above $114,000, pursuant to the attached schedule, annually from Kern Emergency Physicians, to be paid within 10 days of receipt along with proof of the amounts received." (Italics added, unnecessary

4.

capitalization omitted.)  (The parties refer to the *additional* child support amounts encompassed in the court's child support order as "Ostler-Smith amounts," which are variable support amounts, pursuant to *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33 (*Ostler-Smith*[1]).)

The corrected ruling omitted the prior ruling's order as to spousal support.  As to attorneys' fees, the new ruling added:  "The court orders that [Ottoboni] pay [Winter] attorney fees of $3,000.  Said fees are to be paid by March 1, 2011."  Finally, the corrected ruling specified that "[t]he ruling of November 5, 2010 is set aside by this ruling."  (Unnecessary capitalization omitted.)  The family court's corrected ruling was formally docketed as a findings and order after hearing (FOAH) on March 11, 2011. Attached to the FOAH was a schedule for calculating any *Ostler-Smith* child support payments owed under the court's child support order.  (See footnote 1 above.)

***Department of Child Support Services' Motion for Child Support Modification, Etc.***

On February 24, 2016, Winter contacted the Department of Child Support Services (DCSS) for enforcement of the March 11, 2011 FOAH.  On May 24, 2019, DCSS filed a notice of motion for modification of child support, determination of arrears, and determination of *Ostler-Smith* amounts.  Kristen McDonald, an attorney for DCSS, filed a declaration outlining the procedural history of the matter.  McDonald declared: "The current order for [child] support was set forth in a Ruling entered January 14, 2011 and filed in a Findings and Order After Hearing on March 11, 2011.  Child support was ordered for the year 2009 in the total amount of $4,344.00 per month.  Child support was modified as of January 1, 2010 to the total amount of 3,062.00 per month segregated $401.00 to the eldest child [V.W.], [$]533.00 to the second child [M.W.], $763.00 to the third child [E.W.] and $1,364.00 to the youngest child [S.W.]."  McDonald further declared:  "There was a change of custody as to the two elder children, [V.W and M.W],

---

[1]     We will adopt the same terminology as the parties.

5.

on September 10, 2014, whereby sole physical custody was granted to [Ottoboni]. Neither party sought a modification of child support in connection with this change of custody. Per DCSS records, [V.W.] emancipated upon graduation from High School in May 2015, and [M.W.] emancipated upon turning eighteen in November 2016." McDonald added that "DCSS has been informed that [Winter] remarried on December 1, 2011."

McDonald stated in her declaration: "[Ottoboni] is subject to an Ostler-Smith order for additional child support set forth in section twelve of the Findings and Order After Hearing filed March 11, 2011. The language of the order reads: '[Ottoboni] shall, as additional child support, pay on gross amounts she receives above $114,000, pursuant to the attached Schedule, annually in total income from Kern Emergency Physicians, within 10 days of her receipt, along with proof of the amounts received.' A three-page 'Annual Bonus Table for Mother' is attached to the order." McDonald added: "As far as DCSS is aware there have been no payments made pursuant to the Ostler-Smith order as of yet." Finally, McDonald declared: "It is DCSS' belief, based on information received from both parties, that [Ottoboni] left her employment or was terminated in January 2019. Due to the change in employment and because DCSS has no present income information as to [Ottoboni] available, DCSS is filing this Notice of Motion for modification of child support without an attached guideline support calculation."

DCSS also attached a memorandum of points of authorities to its moving papers. The memorandum of points and authorities provided: "DCSS requests judicial determination of the amounts due and owing under the Ostler-Smith order set forth in the Findings and Order After Hearing filed March 11, 2011. Given the inherently uncertain nature of the amount of additional support due under such orders, DCSS cannot seek to enforce the order until the amount is reduced to a sum certain by order of the court." The memorandum of points and authorities further provided: "DCSS submits the issue of

6.

potential equitable credits against arrears to the court's discretion. Pursuant to the Findings and Order After Hearing filed September 10, 2014, there was a change of custody as to the two elder children, [V.W. and M.W.], with sole physical custody granted to [Ottoboni]. It does not appear that either party sought modification of child support in connection with the change of custody. As neither party has at the time of this drafting filed a motion requesting equitable credits [under *Jackson v. Jackson* (1975) 51 Cal.App.3d 363 and *In re Marriage of Trainotti* (1989) 212 Cal.App.3d 1072], DCSS simply submits the issue to [the] court as a potential connected issue in the requested determination of arrears."

The memorandum of points and authorities concluded: "DCSS requests the court render a judicial determination of the arrears owed under the parties' Ostler-Smith order such that DCSS may seek to enforce via collection of a sum certain. In connection with DCSS' request for an overall determination of arrears DCSS restates its request for a payment thereon and proposes that the court may wish to entertain the possibility of equitable credits to [Ottoboni] after she received sole physical custody of the two elder children in 2014."

Ottoboni and Winter thereafter filed their respective responsive papers. After successive rounds of briefing, the matter was finally heard by the family court, Commissioner Dawn Bittleston, on March 5, 2021. The court ordered Winter and Ottoboni to exchange recent tax returns and, along with DCSS, to submit a proposal as to child support commencing June 1, 2019. The court also requested further briefing from the parties on "the Ostler-Smith issues and any requests for Equitable Credits." The court ordered, in this context: "As to the Ostler-Smith issues, the parties are to specifically address whether Ostler-Smith applies to entities other than Kern Emergency Physicians and if it applies to [Ottoboni's] income once she became solely a W-2 salaried employee."

DCSS, Winter, and Ottoboni submitted additional briefing to the court pursuant to its March 5, 2021 order.  We will excerpt and/or summarize parts of Ottoboni's brief on *Ostler-Smith* issues, in light of the brief's relevance to the questions at issue in this appeal.

Ottoboni noted in her brief that she was employed by Kern County at two entities; she was employed at Kern Medical Center (KMC) from 2005 to 2015 and she was employed at Kern Health Authority from 2015 to 2019.  "She was a salaried employee with both entities."  During the proceedings leading to the March 11, 2011 child support order, Ottoboni submitted documentation to the family court demonstrating she had two sources of income at the time.  One source was a "base salary from the county."  The second source was income from Kern Emergency Physicians (KEP); this consisted of "professional fees collected from non-indigent patients who were treated in the [KMC] emergency department (private pay and insurance)."  "[KEP's] sole purpose was to bill and collect fees for services performed, from all the patients seen in the emergency department except those [indigent patients] whose healthcare the county had a responsibility to cover."  "[Ottoboni's] base salary from the county, was the same amount each month.  Her income from KEP, however, varied each month depending on how much was collected from the non-indigent patients."

Ottoboni explained in her brief:  "KEP began dissolving in 2012 and was completely dissolved by 2013."  "After KEP dissolved, *the hospital* continued to bill and collect fees from non-indigent patients, but the difference was [Ottoboni] was no longer allocated a portion of those collected fees like she was when KEP was doing the collections."  (Italics added.)  Thus, "[a]fter KEP dissolved, [Ottoboni's] income no longer fluctuated, and it was no longer separated out by a county base pay versus private pay dollars."  Rather, "[s]he was exclusively a W-2 wage earner going forward and each year her salary was raised to reflect her increased experience and duration of employment

with the county." Ottoboni emphasized in her brief: "Following the dissolution of KEP, [Ottoboni] received no self employment income in the form of a K-1 and was solely a W-2 wage earner."

Ottoboni further observed in her brief: "The only reason an Ostler Smith order was made at all in this case was because of the uncertain income projection for KEP. In support of this, [Ottoboni's] 2010 Income and Expense Declaration (I&E) included a letter from KEP's CPA dated April 30, 2010.… The CPA provided a projection of [Ottoboni's] anticipated monthly income from non-indigent patient fee collections for the remainder of 2010. That projection was $9,500/month or $114,000 for the entire year. It is no coincidence then that the court set the floor amount of self employment income from KEP in the dissomaster at $9,500/month with an Ostler Smith order for her to pay a percentage of amounts received over $114,000 [that is, 9,500 x 12] annually from KEP. This was done so that if the projection was wrong, and she made more than the projected amount in patient collections, then [Winter] would receive a percentage of that as well."

Ottoboni noted in her brief: "Before KEP dissolved in 2012, it could easily be determined how much [Ottoboni] received from the non-indigent patient billing because a K-1 was prepared each year. The varying amounts of income received from KEP necessitated an Ostler Smith order. Once that uncertainty went away, after KEP dissolved, so should have the Ostler Smith order." Ottoboni further observed in her brief: "After KEP dissolved, we have no way of determining how much of [Ottoboni's] yearly salary, may have ultimately been paid by the hospital's collection efforts against non-indigent patients. Even if we did know … how much the hospital received from their collection efforts each month, we do not know how much of that was used to specifically pay [Ottoboni's] salary. This is significant because the Ostler Smith order provides a threshold amount above $114,000 from that part of her income that fluctuated, e.g., KEP,

9.

not from all income because not all her income fluctuated triggering an Ostler Smith percentage, only part of it did and only while KEP was active." (Emphasis in original.)

Ottoboni's brief added: "[Winter] was not without recourse though. It was at that point, in 2013 [after KEP dissolved], when the appropriate course of action would have been for him to request the support orders be modified on account of the change of circumstances, he did not do that. [Winter] did not go back to court even though he was aware of [Ottoboni's] increased base income that was available online; a resource which he used to file for a modification of support previously in 2009. The reason [Winter] did not seek to modify support in 2013 was because he knew that would result in his support getting lowered since [V.W. and M.W. had] discontinued their visitation with him completely as of April 2012."

### *Family Court's August 5, 2021 and January 18, 2022 Rulings on DCSS Motion*

On August 5, 2021, the family court issued an interim ruling as to DCSS's "Notice of Motion seeking modification of current child support, determination of arrears and determination of Ostler-Smith amounts owed."

In its ruling, the court first observed that Ottoboni paid Winter "$1000 per month pursuant to the Court's spousal support order from February 2011 to July 2013." The court noted that Winter "remarried on February 1, 2011" and "never informed [Ottoboni] of his new marriage and continued to accept spousal support payments from [her]." The court stated Ottoboni "overpaid spousal support to [Winter] in the amount of $20,000." The court concluded: "[Winter] owes [Ottoboni] the sum of $20,000. This amount shall be used as an off-set against any child support arrears owed by [Ottoboni] to [Winter]. If no such arrears are owed, [Winter] is to pay [Ottoboni] $20,000 by November 30, 2021."

As for child support, the court noted: "The orders for child support in dispute are not based upon the Judgment but from a November 5, 2010 order by Commissioner James L. Compton. Commissioner Compton ordered that [Ottoboni] pay to [Winter] as

10.

and for child support '$3,062 per month commencing January 1, 2010 ($401, $533, $763 and $1,364 for the children respectively, see the attached dissomaster worksheet). [Ottoboni] shall as additional child support pay on gross amounts she receives above $114,000, pursuant to the attached schedule, annually from Kern Emergency Physicians, to be paid within 10 days of receipt along with proof of the amounts received.' "

Preliminarily, the court ordered that Ottoboni would receive "Jackson/Trainotti[2] equitable credits as to all four children," and specified the monetary amounts and the relevant time period applicable to each child. The court did not order *Jackson/Trainotti* equitable credits for Ottoboni for a limited period between "September 2007 through December 2007," because of a lack of information for this particular period. The court ordered the parties to exchange information for this period and thereafter "to contact DCSS to meet and confer on the issue." The court noted: "Once the information is exchanged, the parties are to contact DCSS to meet and confer on the issue. If the issue remains unresolved, this issue may be placed back on the Court's calendar for determination of the dispute for the months of September 2007 through December 2007."

The court also modified child support. The court stated: "As of March 1, 2019, all minor children were residing with [Ottoboni] and had no visitation with [Winter]. Regardless of the parties' income, [Winter] has a zero percent timeshare with the minor children and in no scenario will [Ottoboni] be required to pay [Winter] child support. [Ottoboni's] child support obligation to [Winter] is set at zero as of May 31, 2019." The court observed: "All of the parties' children emancipated as of June 1, 2021. [E.W. and S.W.] are the only children subject to the current child support modification request. [E.W. and S.W.] reside with [Ottoboni] and do not visit [Winter]." The court noted: "Attached to this Ruling is the Guideline Calculation Results Summary which is

---

[2]    *Jackson v. Jackson*, *supra*, 51 Cal.App.3d 363; *In re Marriage of Trainotti*, *supra*, 212 Cal.App.3d 1072.

incorporated herein as the Court's findings as to child support." The court ordered *Winter to pay child support* to Ottoboni: "Commencing June 1, 2019, [Winter] is ordered to pay to [Ottoboni] the sum of $507 per month segregated $190 for [E.W.] and $317 for [S.W.]. Support for [E.W.] terminates as of May 31, 2020. Support for [S.W.] terminates as of May 31, 2021." The court concluded: "If either party owes the other party arrearages, those shall be paid back at the rate of $500 per month commencing November 1, 2021."

The family court also addressed the issue of any outstanding *Ostler-Smith* payments. The court explained the concept of *Ostler-Smith* payments: "If … bonus or commission income is not predictable, the court may consider (a) excluding it from the calculation of gross income, but order[] the parent who may receive [such] income to notify the other parent on receipt[,] so the other parent may attempt to modify the support payments; or (b) order[] that when bonus or commission income is received, a certain percentage must be paid as additional support. The latter is the better practice. See *Marriage of Ostler & Smith*[, *supra*,] 223 Cal.App.3d 33. This type of order was issued by Commissioner Compton on November 5, 2010."

The court added: "[Ottoboni] was employed by Kern Medical Center from 2005 to 2015, Kern Health Authority from 2015-2019[,] and has been self-employed since 2019. [Ottoboni] had a partnership interest in KEP for the years of 2010, 2011, 2012, 2013, 2014, and 2015. Although it should be noted that KEP began dissolution of the Partnership in 2012, thereafter [Ottoboni's] base W-2 wages while employed at Kern Medical Center increased." The court determined that Ottoboni received from KEP the sum of  $174,390 in 2010, $37,054 in 2011, $18,425 in 2012, ($-94) in 2013, ($-5) in 2014, and zero in 2015.

The court determined: "The only year [Ottoboni] received more than $114,000 from KEP was in 2010. [Ottoboni] never paid additional child support and [Winter]

12.

requested payment of the additional child support. Neither party filed any motions with the court to modify support or enforce the orders issued by Commissioner Compton until 2019. Neither party requested annual income and expense declarations from the other party. Fam. C § 3664. Both parties sat on their legal rights. The Court does not find … the equitable defenses raised by the parties to have merit."

The court further clarified: "[A] support order may not be modified or terminated as to an amount that accrued before the date of filing of the motion to modify. Fam C § 3651(c)(1). The Court does not find that Commissioner Compton's Ostler-Smith Order reached [Ottoboni's] W-2 wages received [from] Kern Medical Center or Kern Health Authority after the dissolution of KEP. There is no applicable case law that authorizes the court to convert the Ostler-Smith order to a salary-based order upon changes in employment compensation. If the Court found that Ostler-Smith Order applied when [Ottoboni] became salary-only, it would be an impermissible retroactive modification of child support." The court concluded: "[Ottoboni] owes [Winter] $7,475 as and for additional child support for 2010. This amount was due and owing commencing January 1, 2011. [Ottoboni] does not owe [Winter] any additional child support for [the] years 2011 and thereafter."

The court ordered DCSS to "prepare an accounting consistent with [its] Ruling," and to file the accounting and serve it on "all parties/counsel by October 8, 2021." Finally, the court ruled that "DCSS shall prepare the Findings and Order After Hearing."

DCSS filed the requisite accounting on October 4, 2021, as well as an updated accounting on December 2, 2021. The accounting filed on October 4, 2021, showed Ottoboni had paid Winter a total of $451,527.88, with overpayment in the amount of $44,925.15. As noted, DCSS filed a second accounting on December 2, 2021. DCSS explained the second accounting was necessary because, in its August 5, 2021 ruling, the court had ordered "the parties to perform certain acts of discovery relative to [equitable

13.

credit] payments for the period of 9/01/2007-12/31/2007." DCSS stated that after it filed the prior accounting on October 4, 2021, Ottoboni provided documentation regarding payments she had made for the September 2007 through December 2007 period, which payments were incorporated into the second accounting, as relevant. The second accounting showed Ottoboni had paid Winter a total of $457,830.88, with overpayment in the amount of $56,878.26.

On January 18, 2022, the family court issued an order after hearing prepared by DCSS, as to DCSS's notice of motion. The court's order after hearing attached and incorporated its August 5, 2021 ruling as the final order of the court. This appeal followed.

## DISCUSSION

### I.  Standard of Review

Child support orders are reviewed for abuse of discretion and the related findings of fact are reviewed for substantial evidence.[3] (*In re Marriage of Zimmerman* (2010) 183 Cal.App.4th 900, 906; *In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1039 ["In conducting this review, appellate courts determine whether the trial court's factual findings are supported by substantial evidence and whether the trial court reasonably exercised its discretion—that is, whether any judge reasonably could have made such an order."].)

### II.  References to November 5, 2010 Order in Final Order, Not Prejudicial

As noted above, the family court issued an interim order on DCSS's notice of motion on August 5, 2021, and subsequently, attached and incorporated the August 5, 2021 interim order in its final order of January 18, 2022. In its August 5, 2021 interim

_____

[3] Ottoboni argues Winter's appeal is improper because the order appealed from "contemplates further proceedings – the preparation of an accounting by DCSS." However, as noted above, DCSS did prepare the requisite accountings and the court issued its final order thereafter. Ottoboni's argument is therefore unavailing.

14.

order, the court referred on two occasions to the child support order made by Commissioner James Compton on November 5, 2010. Commissioner Compton's November 5, 2010 order addressed both child support and spousal support. Commissioner Compton later issued a superseding, corrected order on January 14, 2011, that adopted the identical child support order as the November 5, 2010 order, omitted the spousal support order, and added an attorney's fees order. The January 14, 2011 order further specified that the November 5, 2010 order was thereafter set aside. Commissioner Compton's January 14, 2011 child support order was later issued as a findings and order after hearing or FOAH on March 11, 2011.

As noted, the family court's August 5, 2021 interim order (at issue in this appeal) made two references to Commissioner Compton's November 5, 2010 order, *specifically as to child support*. First, the August 5, 2021 order stated: "The orders for child support in dispute are not based upon the Judgment but from a *November 5, 2010 order by Commissioner James L. Compton*." (Italics added.) Second, the August 5, 2021 order noted: "*On November 5, 2010, Commissioner Compton ordered* that [Ottoboni] pay to [Winter] as and for child support '$3062 per month commencing January 1, 2010 ($401, $533, $763 and $1,364 for the children respectively, see the attached dissomaster worksheet). [Ottoboni] shall as additional child support pay on gross amounts she receives above $114,000, pursuant to the attached schedule, annually from Kern Emergency Physicians, to be paid within 10 days of receipt along with proof of the amounts received.' " (Italics added.)

Winter argues the family court improperly cited Commissioner Compton's November 5, 2010 order, as that order had been superseded by Commissioner Compton's January 14, 2011 order. Winter fails to mention *he* also cited Commissioner Compton's

15.

November 5, 2010 order in his brief to the family court.[4]  For that matter, Ottoboni's brief to the court also referred to Commissioner Compton's November 5, 2010 order. While it is clear the January 14, 2011 order superseded the November 5, 2010 order, the court's erroneous citation to the latter order *did not prejudice* the parties, because the child support orders in the November 5, 2010 ruling *are identical to* the child support orders in the January 14, 2011 ruling.  The differences between the November 5, 2010 order and the corrected January 14, 2011 order have to do with a spousal support provision that was omitted in the corrected order and an attorney fee provision that was added to the corrected order.  In short, for present purposes, there is *no material difference* between the two orders.  Accordingly, Winter cannot show prejudice.

### III.    Final Order Properly Addressed Child Support and *Ostler-Smith* Arrears

Winter makes a number of confusing and disjointed arguments regarding the family court's interpretation and application of the existing child support order of January 14, 2011 (entered as the FOAH on March 11, 2011).

Winter states:  "In 2013, the County of Kern, took over control of the billing of private insurers, and eliminated the need for KEP.  [Ottoboni], remaining in the same position, with the same responsibilities, again contracted with the County of Kern to provide medical services to the County for persons to whom the County provided care. However, she was now being paid through the County of Kern, for private billing or insurance compan[y] paid plans, instead of KEP.  There was not any difference in the services or process of payments for income purposes to her other than to change the private billing from KEP to the County of Kern.  The private billing payment was now coming from the County and not KEP."  Winter complains that Ottoboni did not notify

---

**4**     It appears Winter cited to the November 5, 2010 order, rather than the January 11, 2011 order, because the former order had a complete set of dissomaster worksheets attached to it, while the latter order did not.

him "that the private insurance billing and payer had changed from KEP to the County of Kern" and that "she failed to provide any proof of payments of amounts over or under the $114,000 as ordered by the Court." Winter adds that Ottoboni was "under the obligation through the January 14, 2011 Ruling to notify him as to what portion of [her] income was from KEP even if it was zero."

Winter's arguments are disingenuous and unavailing. The family court disposed of these arguments in its August 5, 2021 order, as follows: "The only year [Ottoboni] received more than $114,000 from KEP was in 2010. [Ottoboni] never paid additional child support and [Winter] never requested payment of the additional child support. Neither party filed any motions with the court to modify support or enforce the orders issued by Commissioner Compton until 2019. Neither party requested annual income and expense declarations from the other party. Fam. C § 3664. Both parties sat on their legal rights. The Court does not find … the equitable defenses raised by the parties to have merit." As the family court noted, Winter sat on his rights and did not request annual income and expense declarations from Ottoboni pursuant to Family Code section 3664. He will not now be heard to complain he was unaware of the scope and amount of Ottoboni's income from Kern County and KEP.

Next, Winter attacks "[t]he proposition that only income from 'KEP' is available for payment of child support under the Ostler-Smith order." He argues this proposition "would seem to run against the public policy/interest," "[e]specially given that the purpose of an Ostler-Smith order is to structure child support orders that are accurate to the income of the payor." He adds, "Ostler-Smith Orders are highly dependent on the moral obligation of the payor spouse to follow through on the notifications of the amount and source of additional income." He states he "is unaware of any statute or rule that would interpret income available for child support being limited by or from whom it was received."

17.

The family court disposed of these arguments as follows: "[A] support order may not be modified or terminated as to an amount that accrued before the date of filing of the motion to modify. Fam C § 3651(c)(1). The Court does not find that Commissioner Compton's Ostler-Smith Order reached [Ottoboni's] W-2 wages received [from] Kern Medical Center or Kern Health Authority after the dissolution of KEP. There is no applicable case law that authorizes the court to convert the Ostler-Smith order to a salary-based order upon changes in employment compensation. If the Court found that Ostler-Smith Order applied when [Ottoboni] became salary-only, it would be an impermissible retroactive modification of child support." We detect no error or abuse of discretion in the family court's ruling.

Under a separate argument heading, Winter further argues: "[T]he Ruling of the Trial Court in the instant case allowed [Ottoboni] to unilaterally reduce the child support obligation to [Winter] by modifying the method of payment of the child support obligation. This interpretation of the duties of the parties would require [Winter] to continuously seek out the employment status of [Ottoboni] to ensure that she had no change in employment status." Winter's argument misses the point. The family court found Ottoboni owed Winter $7,475 in *Ostler-Smith* arrears because she had received more than $114,000 in income from KEP in 2010, *the only year she did so*. Winter has not shown any error in the family court's determination to this effect.

The family court also addressed other child support arrears, beyond *Ostler-Smith* arrears. However, Winter makes no substantive arguments with respect to the family court's determinations as to other child support arrears. Accordingly, we need not address that issue.

We conclude the family court properly enforced the existing January 14, 2011 child support order (entered as the FOAH on March 11, 2011).

18.

**IV.    Family Court Did Not Abuse its Discretion in Not Ordering Attorneys' Fees**

Finally, Winter argues the family court abused its discretion by not awarding him attorneys' fees in the amount of $25,000, in its final order.  Winter concedes, however, that his request for $25,000 in attorneys' fees consisted merely of a couple of sentences in his *trial brief* to the effect his counsel had expended 60 hours on this matter, at the rate of $400/hour, and he was therefore requesting $25,000 in attorneys' fees.  Winter did not file a noticed motion, order to show cause, or request for order as to attorneys' fees.  Accordingly, there was no request for attorneys' fees before the court and there was nothing for the court to rule on in this regard.

## DISPOSITION

The judgment is affirmed.  Ottoboni is awarded her costs on appeal.


SMITH, J.

WE CONCUR:


LEVY, Acting P. J.


SNAUFFER, J.

19.